IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| VALERIE L. HUESTIS, | ) | 4:11CV3004 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Valerie L. Huestis, brings this suit challenging the Social Security Commissioner's final administrative decision denying her applications for disability insurance benefits and supplemental security income payments under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401 *et seq.*,1381 *et seq.*[1] For the reasons discussed below, the Commissioner's decision will be affirmed.

## I. BACKGROUND

Plaintiff protectively filed her applications on August 13, 2007 (Tr. 120-30).[2] Her claims were denied initially on September 20, 2007(Tr. 54-58), and on reconsideration on March 20, 2008 (Tr.65-69). An administrative law judge ("ALJ") conducted a hearing on September 16, 2009, at which Plaintiff was represented by counsel. (Tr. 20-53). On November 27, 2009, the ALJ issued an unfavorable decision,

---

[1] Sections 205(g) and 1631(c)(3) of the Act, 42 U.S.C. §§ 405(g), 1383(c)(3), provide for judicial review of the Commissioner's final administrative decisions under Titles II and XVI.

[2] The transcript ("Tr.") or administrative record was electronically filed by the Commissioner and docketed as filing 14.

determining that Plaintiff is not under a "disability" as defined by the Act (Tr. 6-19). On November 6, 2010, the Appeals Council denied Plaintiff's request for review (Tr. 1-3). Thus, the decision of the ALJ stands as the final decision of the Commissioner.

### A. The ALJ's Findings

The ALJ evaluated Plaintiff's claim according to the 5-step sequential analysis prescribed by the Social Security Regulations[3] and made these findings:

>   1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.
>
>   2. The claimant has not engaged in substantial gainful activity since February 23, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
>   3. The claimant has the following severe impairment: degenerative disc disease of the lumbar spine (20 CFR 404.1520(c) and 416.920(c))
>
>   4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

---

[3] "At the first step, the claimant must establish that he has not engaged in substantial gainful activity. The second step requires that the claimant prove he has a severe impairment that significantly limits his physical or mental ability to perform basic work activities. If, at the third step, the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits. If the claimant cannot carry this burden, however, step four requires that the claimant prove he lacks the [residual functional capacity ('RFC')] to perform his past relevant work. Finally, if the claimant establishes that he cannot perform his past relevant work, the burden shifts to the Commissioner at the fifth step to prove that there are other jobs in the national economy that the claimant can perform." *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006) (footnote omitted).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, sit, stand, and walk for six hours each in an 8-hour day, occasionally climb, stoop, crouch, and crawl, and should avoid concentrated exposure to extreme cold, vibration, and hazardous machinery and heights.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on February 15, 1966, and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from February 23, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 11-16)

## B. *Statement of Issues*

Plaintiff contends the ALJ failed to make a proper assessment of her residual functional capacity and committed reversible error by (1) finding that her subjective

complaints of pain were not fully credible and (2) giving little weight to the opinion of her treating physician, Dr. Steven Husen.

### C. Statement of Facts

Plaintiff was employed as a patient care assistant in a nursing home between February 2005 and February 2007 (Tr. 167). She claims disability due to a work-related injury (Tr. 166).

#### 1. Medical Evidence

On January 12, 2007, Plaintiff visited the emergency room complaining of pain in her back and right groin area (Tr. 255). She said that the pain had a sudden onset, and occurred when she was moving food trays at work, but it did not appear to be associated with activity (Tr. 255). She reported no history of injury or disk disease, and had no numbness, tingling or weakness of the lower extremities (Tr. 255). On examination, straight leg raising was negative bilaterally, and no focal weakness was noted in the upper and lower extremities (Tr. 255). The doctor assessed right lower back pain, probably mechanical (Tr. 256).

On February 23, 2007, Plaintiff returned to the emergency room complaining of back pain after lifting a patient that day at work (Tr. 246). The doctor assessed mechanical back strain and restricted her to light duty for one week (Tr. 246). After this work injury, Plaintiff was followed by Larry L. Hansen, M.D., and began attending physical therapy sessions (Tr. 221-33).

On March 1, 2007, Mia J. Hyde, PA-C, a physician's assistant in Dr. Hansen's office, examined Plaintiff and interpreted an x-ray of her lumbar spine; Ms. Hyde made an assessment of acute lumbar strain and osteoarthritis (OA) with degenerative vertebral changes to L3-4 and L4-5 (Tr.226-27).

On March 2, 2007, the physical therapist, Jeremiah Johnsen, wrote Dr. Hansen to report on his initial visit with Plaintiff that day (Tr. 232-33). Plaintiff indicated that her back was "considerably better then [sic] it was a week ago," but that she would be off work until her follow-up visit with Dr. Hansen on March 8 (Tr. 232). She "ambulate[d] with a slow, antalgic gait pattern favoring the lower left extremity" and was tender on palpation of the lower back (Tr. 232). Mr. Johnsen planned to see Plaintiff three times a week for the next two weeks (Tr. 233).

On March 8, 2007, Dr. Hansen noted that Plaintiff was returning to work that day (Tr. 225). On March 12, 2007, Plaintiff reported to Dr. Hansen that her back was doing better; on examination, her range of motion was "normal" (Tr. 224).

On March 16, 2007, Mr. Johnsen reported to Dr. Hansen that after 5 treatments Plaintiff had stated that her pain had "decreased significantly." (Tr. 231) She reported that her work restrictions involved 4-hour days with no lifting from March 12 to 16, 6-hour days with a 5-pound lifting restriction from March 19 to 23, and 8-hour days with a 10-pound lifting restriction from March 26 to 30 (Tr. 231). On examination, Plaintiff "ambulate[d] with a normal gait pattern" and "no significant tenderness" in the lumbar spine (Tr. 231). Mr. Johnsen planned to continue to see Plaintiff 3 times per week until her next appointment with Dr. Hansen on April 2 (Tr. 231).

On March 27, 2007, the physical therapist reported that, at her last visit on March 22, Plaintiff stated that her low back was "feeling pretty good and it ha[d] not been as sore as prior visits." (Tr. 230) Mr. Johnsen noted that Plaintiff had cancelled an appointment since his last progress report and had also "no showed" on March 23 and had not scheduled another appointment (Tr. 230). He also reported that Plaintiff "at times [was] unwilling to perform all of her exercises to completion" and needed verbal and tactile clues to perform exercises that she was supposed to be doing at home (Tr.. 230).

Dr. Hansen's notes for April 2, 2007, indicated that Plaintiff had no pain and "want[ed] regular duty" (Tr. 223). His notes for April 9, 2007, indicated that Plaintiff had achieved maximum medical improvement (MMI) (Tr. 222).

On April 9, 2007, a physical therapist at a different clinic, Mike Kalvoda, wrote Dr. Hansen a letter thanking him for referring Plaintiff to physical therapy and stating that she had been seen for "work conditioning type activities" on April 2, 5, and 6 (Tr. 229). He "recommend[ed] upwards of 3 to 4 hours of therapy per day to increase her tolerance for her activities of daily living." (Tr. 229).

On May 10, 2007, Plaintiff visited Steven L. Husen, M.D., for the first time in over a decade (Tr. 235). Plaintiff reported that her back pain had been reasonably well-controlled on the muscle relaxant, non-steroidal anti-inflammatory drug (NSAID), and pain medication prescribed by Dr. Hansen (Tr. 235). Plaintiff said that she had not been able to go to physical therapy since mid-April because Dr. Hansen had released her from his care, "letting workman's comp know that she had recovered from her back injury." (Tr. 235) She complained that her back pain had gotten worse since she had stopped her medications and physical therapy (Tr. 235). She also complained of radicular right leg pain (Tr. 235). Physical examination revealed paraspinous muscle spasm and some soreness over L4-L5 and L5-S1 (Tr. 235). Plaintiff had a positive straight leg raising test on the right, but no obvious reflex loss (Tr. 235). The doctor assessed low back pain and right L5 lumbar radiculopathy/right sciatica, and prescribed Lortab, Mobic, and Skelaxin (Tr. 235). He also ordered a magnetic resonance imaging (MRI) scan of Plaintiff's lumbar spine, which revealed mild degenerative changes (Tr. 235, 243).

Plaintiff was next seen by Dr. Husen in July 2007, after re-injuring her back while trying to lift her aunt from the bathtub (Tr. 236). The doctor noted that Plaintiff was not having "any of her radicular symptoms" (Tr. 236). Physical examination revealed "a lot of" paraspinous muscle spasm, and tenderness over the L5-S1 area and S1 joints (Tr. 236). Plaintiff's straight leg raising test was negative, and there was no

-6-

evidence of lumbar nerve root irritation (Tr. 236). The doctor assessed acute musculoligamentous back strain, and told her to take her previously-prescribed pain medication at more frequent intervals (Tr. 236).

On September 20, 2007, a state agency physician, Roderick Harley, M.D., completed a physical residual functional capacity assessment form based on a review of Plaintiff's medical records (Tr. 262-70). He opined that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, could stand or sit about 6 hours in an 8-hour workday, was not limited in pushing or pulling, could frequently balance and kneel, and could occasionally climb, stoop, crouch, and crawl (Tr. 263-64). He also opined that Plaintiff had no manipulative or communicative limitations, but should avoid concentrated exposure to extreme cold and vibration (Tr. 265-66). Dr. Harley concluded that Plaintiff's complaints were only "partially credible," stating: "While she has a degree of pain, she is able to walk about normally and has normal strength with no neurological deficits. She should be capable of lighter types of work activities." (Tr. 269)

Plaintiff saw Dr. Husen again in September 2007, for complaints unrelated to her allegedly disabling impairments (Tr. 278). She next returned to see Dr. Husen on January 7, 2008, at which time she complained of right shoulder pain and "also a flare-up of her chronic back pain" (Tr. 279-80). Plaintiff indicated she had strained her shoulder a couple of months before attempting to move a table (Tr. 279). Physical examination revealed ongoing discomfort across her lower back (Tr. 280). The doctor assessed right shoulder pain secondary to rotator cuff tendonitis and chronic low back pain secondary to degenerative disk disease, and recommended physical therapy (Tr. 280). Dr. Husen refilled Plaintiff's prescriptions for Mobic and Skelaxin, and also placed her on Celexa (Tr. 280).

The record indicates that Plaintiff underwent initial physical therapy evaluations for her back and shoulder pain the following day (Tr. 288-91). She had a negative seated neural tension test, but a positive supine neural tension test; all other special

tests were negative (Tr. 289). The physical therapist assessed pain in the low back, mild myofascial tightness, as well as pain and decreased range of motion and strength in the right shoulder (Tr. 289, 291). Plaintiff stated that she received treatment at the clinic in April 2007 but "she was then fired for missing treatments of her care and her Workers' Compensation status has been terminated at that point." (Tr. 288) Plaintiff also reported that "she was working at a school over the holidays, however that job has since ended[.]" (Tr. 288)

Dr. Husen's records indicate that Plaintiff called in complaining of a headache, sinus symptoms, and stomach upset on January 16, 2008 (Tr. 280). The doctor ordered Plaintiff to discontinue one of her medications and re-start it at a half-dose if her sinus symptoms resolved, or to call back if they did not (Tr. 280).

On February 25, 2008, Jerry Reed, M.D., a state agency physician, reviewed Plaintiff's updated medical records, found them to be consistent with earlier records, and "affirmed as written" the prior RFC assessment by Dr. Harley (Tr. 292).

On February 29, 2008, Plaintiff was interviewed by a psychologist, A. James Fix, Ph.D., on referral from the state agency (Tr. 294-99). Plaintiff reported that she was "let go from [her] job because she was taking time off because of her injury and also because of illness in her family." (Tr. 295) Dr. Fix diagnosed Plaintiff with "[d]epression secondary to medical condition." (Tr. 298)

In a letter to Plaintiff's attorney dated September 10, 2009, Dr. Husen explained that Plaintiff "was last seen for an official visit" in his office on July 28, 2008,[4] but "ha[d] been in to the office on multiple occasions along with her aunt who she helps take care of at home on a limited basis" (Tr. 316). Dr. Husen provided the following opinion regarding Plaintiff's back condition:

---

[4] In her brief, Plaintiff states that she visited Dr. Husen on July 28, 2008, but that "[t]he treatment note documenting that visit is not a part of the record." (Filing 17 at 4)

-8-

> Ms, Huestis, as noted, does have significant degenerative disk disease and as a result of her degenerative disk disease has chronic low back pain with radicular leg pain. Her back pain and leg pain is aggravated by any lifting, bending, or twisting. She also, because of her degenerative disk disease, has significant activity tolerance limitations. She cannot stand for more than 10 to 15 minutes comfortably without pain intensifying in her back and radiating into her buttocks and down her legs. Sitting also is uncomfortable. Her only position that she can get truly pain free is if she lays down and has her knees flexed, then she can find a reasonably comfortable position although her back pain does cause her to wake or arouse several times a night affecting the quality of her sleep.
>
> I do feel that her back condition does significantly impair her ability to sit or stand for any length of time. I also feel that it frequently interrupts her nighttime sleep. I also feel that her [sic] affects her ADL's and limits what she can do as far as even minor activity around the home. She is unable to perform any activity that requires twisting at the waist or bending. She cannot do any type of lifting without significant aggravation of her back problem.

(Tr. 316) Dr. Husen continued by stating, "I do not feel that she could complete a 40-hour work week given the level of pain she experiences and her significant functional limitations. I feel that she is unable to work at this time." (Tr. 317) He found Plaintiff to be "credible," stating: "I believe her complaints of back pain are legitimate and her work capacity is significantly impaired because of her ongoing back pain and radicular leg pain." (Tr. 317) He concluded: "As noted. her diagnosis at this time is significant degenerative disk disease of the lumbosacral spine with degenerative arthritis of the facet joints as well as chronic S1 dysfunction. The result of all of these is her ongoing chronic back pain and radicular leg pain." (Tr. 317)

### *2. Plaintiff's Testimony*

At the administrative hearing in September 2009, Plaintiff testified she was 43 years old and had received a general equivalency degree, as well as vocational training

as a certified nursing assistant (Tr 27). Plaintiff said that she lived with her sister, 24-year-old son, and 9-year-old daughter (Tr. 26). She said that she had done some babysitting over the summer and was currently working about 10 hours per week as a teacher's helper at her daughter's school, reading to children (Tr. 26-29). Previously she worked 2-hour shifts as a lunchroom monitor at the same school, beginning in October 2007 (Tr. 199, 219).

Plaintiff testified that she had constant, crushing pain in her lower back which extended into her hips (Tr. 30-31). Plaintiff explained that she took medications and hot baths to relieve her pain (Tr. 31-32, 38). She said that she had not had any surgical consultations (Tr. 33). Plaintiff testified that she could generally manage her personal care needs, prepare sandwiches and simple meals with her daughter, take her daughter to school if she felt up to it, help rinse the dishes, accompany her family members on short trips to the grocery store, go to the YMCA for water therapy, attend church on Sunday mornings, and drive her car short distances (Tr. 34-37, 42).

During questioning by her attorney, Plaintiff denied ever telling Dr. Hansen that she had no pain (Tr. 41). She complained that "he shut me off of, they shut me off of workman's comp, that's who I was going to him through, so I told him he's just going to have to release me then . . . because that's when I thought I could just try to find some kind of work . . .." (Tr. 41)

## II. DISCUSSION

The applicable standard of review is whether the Commissioner's decision is supported by substantial evidence on the record as a whole. *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). " Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." *Id.* (internal quotations and citations omitted). Evidence that both supports and detracts from the Commissioner's decision should be considered, but a

final administrative decision is not subject to reversal by a reviewing court merely because some evidence in the record may support a different conclusion. *See id.*

Questions of law, however, are reviewed de novo. *See Olson v. Apfel*, 170 F.3d 822 (8th Cir. 1999); *Boock v. Shalala*, 48 F.3d 348, 351 n2 (8th Cir. 1995). Legal error may be an error of procedure, *Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003), the use of erroneous legal standards, or an incorrect application of the law, *Nettles v. Schweiker*, 714 F.2d 833, 836 (8th Cir. 1983).

### *A. Plaintiff's Credibility*

A claimant's residual functional capacity represents the most she can do despite the combined effect of her credible limitations. *See* 20 C.F.R. §§ 404.1545, 416.945. The ALJ is responsible for assessing a claimant's RFC based on all the relevant evidence, including the claimant's description of her limitations, the medical records, and observations of the claimant's physicians and others. *See Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). In making this assessment, the ALJ has discretion to discredit a claimant's self-reported limitations if he determines they are inconsistent with the record based on his evaluation of the relevant factors set forth in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), and 20 C.F.R. §§ 404.1529, 416.929. Such factors include the claimant's prior work records; observations by third parties and physicians regarding the claimant's disability; the claimant's daily activities; the duration, frequency, and intensity of pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medications; and the claimant's self-imposed functional restrictions. *See Polaski*, 739 F.2d at 1322. "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) (quoting *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010)). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." *Id.*

The ALJ determined that Plaintiff's complaints of pain were not fully credible and he offered the following explanation:

> The claimant has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. The claimant reported in September 2007 that she vacuumed, mowed a little at a time, drove up to 50 miles, swam with her daughter, took daughter to and from school, shopped, watched television, and went to church. She did indicate, however, she could only stand for 20 minutes and sit for 30 minutes and that mopping was difficult (Exhibit 4E).
>
> The claimant's mother, Inez Smith, reported in January 2008 that the claimant visited with friends and relatives weekly, took care of her 7-year-old daughter, watched television, went to church, took her daughter to and from school, cooked, and worked as a lunchroom monitor. Ms. Smith stated that she helped the claimant shop, do laundry, and vacuum (Exhibit 8E).
>
> The claimant testified that she works as a teacher's helper reading with children for 10 hours a week, making $8.00 an hour. She said she also babysat during the summer for children ages 9, 10, and 12. The claimant stated that her back pain radiates into both hips and is constant. On a pain scale of one to 10, she stated her back pain was a five. She said she was in physical therapy for four to five months, but stopped when her insurance stopped. She stated she was told she needed injections but had no insurance. She stated she has never had a surgical consultation. She testified that she does stretches with her legs, takes her child to school, goes to school for two hours, watches television, checks her email on the computer, goes to church weekly, takes care of her own personal needs, and prepares sandwiches, but does not do housecleaning. She alleged that her sister or mother vacuums, her daughter makes the beds and washes the dishes, and her son does the laundry. The claimant stated that she goes grocery shopping with her sister and son. The claimant sated that she can only walk two to three blocks, then must sit for 10 to 15 minutes, stand for 10 to 15 minutes, sit for 20 minutes, and lift 10 to 15 pounds. She stated that she cannot work more than two hours a day doing her job, and she gets special accommodations at work.

>After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment. The claimant went through physical therapy that was helpful, but quit because her insurance stopped. It was noted at times, the claimant was unwilling to complete all of her therapy exercises. There was mild myofascial tightness noted, and lumbar range of motion was 40 degrees of lordosis, 35 degrees of flexion, and 15 degrees extension (Exhibits IF; 7F-8F). In 2008, the claimant told Dr. Fix that she was helping in the lunchroom of her daughter's school. Even though the claimant said she isolated herself, it really did not seem to be restricted with activities of daily living (Exhibit 8F, p. 5).

(Tr. 13-14)

Plaintiff claims the foregoing explanation contains several mistakes. First, regarding the lumbar range of motion recorded by the physical therapist, Plaintiff notes that the ALJ omitted the P.T.'s comments that the 35º of flexion and 15º of extension were both "painful." (Tr. 288).[5] Perhaps the ALJ's statement should have been more complete, but it is not inaccurate. Second, Plaintiff protests that she "does not monitor the lunchroom. She explained that she works as a teacher's aide 2 hours a day and does so only with accommodation, such as sitting in comfortable chairs and being able to stand, walk, and sit when she so chooses." (Filing 17 at 16) This, however, is not inconsistent with the ALJ's recitation that Plaintiff "works as a teacher's helper reading with children for 10 hours a week" and "stated that she cannot work more than two hours a day doing her job, and she gets special accommodations at work" (Tr. 14) The ALJ also stated, correctly, that Plaintiff reported to Dr. Fix that she was working as a lunchroom monitor in 2008 (Tr. 298). Third, Plaintiff criticizes the ALJ for not noting that she "completed additional

---

[5] The evaluation was made on January 8, 2008 (Tr. 288-89). The record does not indicate that Plaintiff received any physical therapy after that date.

therapeutic sessions following the date the statement was made that [she] was allegedly unwilling to complete all of her therapy exercises." (Filing 17 at 16) The ALJ was not commenting upon Plaintiff's failure to continue with physical therapy, but, rather, upon her reported "unwillingness to complete all of her therapy exercises" during her therapy sessions (Tr. 230).[6]  Fourth, Plaintiff takes issue with the ALJ's statement that "in September 2007 . . . she vacuumed, mowed a little at a time, . . . [and] swam with her daughter" (Tr. 13), but this is precisely what Plaintiff wrote in a daily activities and symptoms report she completed in September 2007 (Tr. 185-86). Fifth, and finally, Plaintiff argues that the ALJ mischaracterized her testimony regarding daily activities and did not mention "significant limitations [she] testified experiencing." (Filing 21 at 6) Without going into detail, I find the ALJ's summary of Plaintiff's testimony to be accurate and reasonably complete.

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Vossen*, 612 F.3d at 1017 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)). Thus, I must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Boettcher v. Astrue*, 652 F.3d 860, 2011 WL 3802780, at *2 (8th Cir. 2011) (quoting *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006)).  *See also Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) ("If the ALJ discredits a claimant's credibility and gives a good reason for doing so, we will defer to its judgment even if every factor is not discussed in depth."). The ALJ has provided good reasons for his credibility findings and there is substantial evidence to support them. *See, e.g., Medhaug v. Astrue*, 578 F.3d 805, 816 (8th Cir. 2009) (ALJ properly considered that claimant's back pain responded to medical treatment and that he maintained activities of daily living with minimal accommodations).

---

[6] The P.T. also reported to Dr. Hansen on March 27, 2007, that Plaintiff had not shown up for an appointment on March 23 and had failed to reschedule (Tr. 230). It does appear that Plaintiff thereafter attended three physical therapy sessions at a different clinic (Tr. 229).

"Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." *Id.* at 817 (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001)). For example, it has been held that "acts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain." *Id.* (citing *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir.2005); *Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999)). *See also Dunahoo*, 241 F.3d at 1038 (concluding "daily activities [such] as getting up, eating, reading, cleaning the house, making the bed and doing dishes with the help of [a spouse], making meals, visiting with friends, and occasionally shopping and running errands" are inconsistent with a claimant's subjective complaints of disabling pain).

"While an ALJ may not discredit subjective complaints based solely on the lack of objective medical evidence, *see Brosnahan v. Barnhart*, 336 F.3d 671, 677-78 (8th Cir.2003), an ALJ may use the lack of such evidence as one credibility factor, *see Curran-Kicksey v. Barnhart,* 315 F.3d 964, 968 (8th Cir.2003)[.]" *Pitman v. Barnhart,* 116 Fed.Appx. 774, 775, 2004 WL 2699104, at *1 (8th Cir. 2004). "Impairments that are controllable or amenable to treatment do not support a finding of disability." *Davidson v Astrue*, 578 F.3d 838, 846 (8th Cir. 2009). "In addition to the results of objective medical tests, an ALJ may properly consider the claimant's noncompliance with a treating physician's directions, *Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir.2001), including failing to . . . seek treatment, *Comstock v. Chater*, 91 F.3d 1143, 1146-47 (8th Cir.1996), . . .." *Choate v. Barnhart*, 457 F.3d 865, 872 (8th Cir. 2006).

### B. Treating Physician's Opinion

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite impairment(s), and [his] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) . The weight the Commissioner will give

to an opinion depends upon (1) whether the source examined the claimant, and, if so, the frequency of examination; (2) whether the source treated the claimant, and, if so, the length, nature, and extent of the treatment relationship; (3) whether the opinion is supported by relevant evidence; (4) whether the opinion is consistent with the record as a whole; (5) whether the source is a specialist; and (6) any other relevant factors. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d).

A "treating source" is an acceptable medical source who provided the claimant "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. §§ 404.1502, 416.902. "If [the Commissioner] find[s] that a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, [the Commissioner] will give it controlling weight." 20 C.F.R. §§ 404.1527(d), 416.927(d). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin., July 2, 1996). An adverse decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*

Here, the ALJ decided to give little weight to the September 2009 letter drafted by Dr. Husen, in which he opined, among other things, that Plaintiff was "unable to work at this time." (Tr. 317) The ALJ stated:

> Family Practitioner Dr. Steven Husen reported in September 2009 that the claimant suffered from degenerative disc disease with associated chronic back pain and chronic radicular leg pain. He said her last official visit was in July 2008, but she had been into the office on multiple

-16-

> occasions along with her aunt who she helps take care of at home on a limited basis. Dr. Husen noted the claimant's pain is aggravated by any lifting, bending, or twisting, and she cannot stand more than 10 to 15 minutes. Dr. Husen felt that her back condition significantly impaired her ability to sit or stand for any length of time, and was unable to perform any activity that requires twisting at the waist or bending or any type of lifting. He did not feel that she could complete a 40-hour workweek given the level of pain and significant functional limitations, and would be unable to work at this time (Exhibit 10F). I give little weight to Dr. Husen as his statements are inconsistent with the medical evidence. He noted she had significant degenerative disease, but the MRI showed mild degenerative changes with no significant stenosis (Exhibit 2F, page 4). Moreover, his clinical findings do not support his conclusion, which is on an issue reserved to the Commissioner.

(Tr. 14-15)

The record shows that Plaintiff visited Dr. Husen three times because of back pain. The first visit was on May 10, 2007, about five weeks after Plaintiff was last seen by Dr. Hansen. Plaintiff reported that while she was under Dr. Hansen's care, and performing light duty, "her pain was reasonably well controlled" by medications, including Celebrex, Skelaxin, and Lortab (Tr. 235). However, "[s]ince not being able to go to therapy and having her medications, her back has been hurting quite a bit worse." (Tr. 235) Dr. Husen prescribed Mobic, Skelaxin, and Lortab and ordered an MRI because Plaintiff was also complaining of "some radicular right leg symptoms that seem to be activity related." (Tr. 235) The MRI revealed only "[m]ild degenerative changes" and "[n]o significant central or neuroforminal stenosis." (Tr. 237, 243) It appears that Plaintiff's scheduled follow-up visit to Dr. Husen was cancelled, but her prescriptions were refilled by phone on June 25, 2007 (Tr. 236). Plaintiff next saw Dr. Husen on July 24, 2007, after she re-injured her back while trying to lift her aunt from the bathtub (Tr. 236). The doctor noted that Plaintiff was not having "any of her radicular symptoms" but there were muscle spasms and tenderness in her lower back (Tr. 236). Dr. Husen refilled the prescriptions, recommended some back exercises, and told Plaintiff to let him know if she was not

getting better in the next few days (Tr. 236). Plaintiff did not see Dr. Husen again for back pain until January 7, 2008, when she was complaining primarily about a shoulder injury that occurred when she tried to move a table (Tr. 279). Dr. Husen refilled the prescriptions for Mobic and Skelaxin and referred Plaintiff to physical therapy (Tr. 280). The physical therapist examined Plaintiff the next day and developed a treatment plan with the goals of Plaintiff having no pain while at rest within 2 weeks, being able to bend forward without pain in 4 weeks, and being able to tolerate 8 hours of activity pain free within 8 weeks (Tr. 289). Plaintiff does not appear to have followed through with this treatment plan. Dr. Husen stated in his September 2009 opinion letter that Plaintiff "was last seen for an official visit" in his office on July 28, 2008 (Tr. 316), but there are no treatment notes for that visit in the record.

I find that the ALJ properly discounted Dr. Husen's opinion as not being supported by his own clinical records and as being inconsistent with other medical evidence. Dr. Husen stated that Plaintiff has "significant degenerative disk disease," (Tr. 316), but this inconsistent with the result of the MRI study he ordered in January 2008, which showed only mild degenerative changes (Tr. 235, 243). Dr. Husen also stated that the degenerative disk disease causes "radicular leg pain" (Tr. 316) even though Plaintiff was not having any radicular symptoms when he saw her in July 2007 (Tr. 236) and she also did not report any leg pain in January 2008 (Tr. 279-80). Most of the limitations noted by Dr. Husen in his letter appear to have been based on Plaintiff's subjective complaints rather than on medically acceptable clinical and laboratory diagnostic techniques. Where, as here, a treating physician's opinion is based largely on the patient's subjective complaints with little objective medical support, and is inconsistent with the record as a whole, it is entitled to little weight. *See Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. 2005)*.

### *III. Conclusion*

Accordingly, I conclude that the ALJ's decision is supported by substantial evidence on the record as a whole and is not contrary to law.

IT IS ORDERED that the decision of the Commissioner is affirmed pursuant to sentence four of 42 U.S.C. § 405(g). Final judgment will be entered by separate document.

October 17, 2011.                               BY THE COURT:

                                                *Richard G. Kopf*
                                                United States District Judge

---

\*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.